Deborah A. Sivas (CA Bar No. 135446)
Matthew J. Sanders (CA Bar No. 222757)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 723-0325
Facsimile: (650) 723-4426
Email: dsivas@stanford.edu
Email: matthewjsanders@stanford.edu

*Attorneys for Plaintiff Unite the Parks*

René P. Voss (CA Bar No. 255758)
NATURAL RESOURCES LAW
15 Alderney Road
San Anselmo, CA  94960
Phone:  (415) 446-9027
Email:  renepvoss@gmail.com

*Attorney for Plaintiffs Sequoia ForestKeeper
and Earth Island Institute*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITE THE PARKS; SEQUOIA FORESTKEEPER; and EARTH ISLAND INSTITUTE,<br><br>         Plaintiffs,<br><br>    v.<br><br>UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; and UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the Interior,<br><br>         Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This action challenges the failure of the United States Forest Service ("USFS") and United States Fish and Wildlife Service ("FWS") to adequately evaluate, protect, and conserve the critically endangered Southern Sierra Nevada Pacific fisher ("SSN fisher" or "fisher") on the Sierra, Sequoia, and Stanislaus National Forests, as required by the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

2.      The SSN fisher is a geographically isolated and genetically unique population of the Pacific fisher (*Pekania pennanti*) that is teetering on the brink of extinction.  A decade ago, scientists using habitat-based models estimated that the SSN fisher population consists of somewhere between 100 and 500 individuals, far below the scienced-based consensus that the minimal viable population size for terrestrial mammals is greater than 3,800 individuals.  Since those SSN fisher population estimates were developed, suitable fisher denning and resting habitat, which is essential for reproduction, has been reduced by more than 50 percent on the Sierra and Sequoia National Forests as a result of a prolonged multi-year drought and significant wildfires (including two massive wildfires in late 2020) or destroyed or degraded into non-habitat by continued logging and other "vegetation management" activities by USFS.  These landscape alterations have likely reduced individual SSN fisher numbers and adversely affected their long-term prospects for survival.

3.      Despite dramatic changes in the environmental baseline conditions for SSN fisher habitat over the last decade, USFS has continued to plan and carry out significant logging and related "vegetation management" activities, and FWS has continued to sanction such activities, without considering and evaluating the current population size or viability of the SSN fisher or conducting a cumulative impacts analysis of these activities.  These management activities are spread across at least 45 individual "projects" approved incrementally by USFS over many years.

4.      Because the SSN fisher is listed as an endangered species under the ESA, the most recent wildfires on the Sierra and Sequoia National Forests during the late summer and fall of 2020, which burned more than half a million acres, including tens of thousands of acres of SSN

fisher habitat, required USFS and FWS to reinitiate ESA consultation in connection with ongoing and proposed USFS activities and projects.  As part of this consultation, USFS summarily concluded that even though the 2020 wildfires affected nearly 300,000 acres of fisher habitat and burned through several identified corridors through which fishers travel and disperse from one habitat area to another, the fires will not materially affect the survival of the SSN fisher and thus do not require alteration of previously-planned USFS logging projects, and FWS subsequently endorsed that USFS conclusion in its revised Programmatic Biological Opinion.  In carrying out this consultation and reaching these conclusions, neither agency conducted any new population estimates or viability analysis, nor did they provide any relevant science to support their conclusions about fisher populations.

5.      Instead, the agencies' conclusions were based on a theory that, while proposed USFS projects will continue to have short-term adverse impacts on fishers, the actions and activities approved as part of these projects will, over the next several decades, reduce wildfire risks and thereby actually "benefit" fishers in the long term.  There is no evidence-based science to support this theory, which merely provides an unsubstantiated justification for USFS to continue logging trees and disrupting essential fisher habitat features that the agencies concede will take decades or centuries to reestablish.  Moreover, in the course of making the assertion that further logging would reliably and consistently reduce future fire severity, the agencies ignored a deep body of scientific evidence concluding that commercial thinning, post-fire logging, and other logging activities conducted under the rubric of "fuel reduction" more often tend to *increase*, not decrease, fire severity.

6.      The listing of the SSN fisher as an endangered species on May 15, 2020 and the subsequent wildfires that burned over 500,000 acres during the late summer and fall of 2020 constitute significant new circumstances and information relevant to the impact of the USFS's ongoing and proposed management actions on the fisher and its habitat that have never been considered in any cumulative environmental review under NEPA.  USFS approvals for the 45 logging and other "vegetation management" projects that could affect SSN fishers and fisher habitat were accompanied by individual project analyses that did not evaluate these subsequent

1  cumulative impacts and could not have done so.  Yet USFS intends to move forward with these

2  projects in the absence of any supplemental environmental review or cumulative effects evaluation

3  under NEPA.

4        7.     By failing to undertake adequate evaluation of aggregate effects, by failing to use

5  the best available science, by relying on speculative and unsupported theories of long-term

6  benefits, and by failing to protect and conserve the SSN fisher, USFS and FWS have violated, and

7  are continuing to violate, the ESA and its implementing regulations, and USFS has violated, and is

8  continuing to violate, NEPA and its implementing regulations.  Accordingly, the Court should set

9  aside and vacate FWS's revised Programmatic Biological Opinion, enjoin the logging and other

10  "vegetation management" actions detailed below, and order USFS to prepare a supplemental

11  NEPA analysis for the cumulative effects of its proposed activities on the SSN fisher.

12  **JURISDICTION AND VENUE**

13        8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

14  question), 16 U.S.C. § 1540(g) (ESA citizen suits), and 28 U.S.C. §§ 2201 and 2202 (Declaratory

15  Judgment Act).  Plaintiffs have exhausted all administrative remedies, and the violations of law

16  claimed below are ripe for judicial review.

17        9.     Venue lies in this District, pursuant to 28 U.S.C. § 1391(e), because the property

18  and events giving rise to this lawsuit occur in this District and because Defendants reside within

19  the District.

20        10.    Because a substantial part of one of the events or omissions which give rise to the

21  claims herein – the various projects in the Sierra, Sequoia, and Stanislaus National Forests –

22  occurred in Fresno, Kern, Tulare, Madera, Mariposa, and Tuolumne Counties, assignment to the

23  Fresno Division of this Court is proper under Civil Local Rule 120(d).

24        11.    An actual justiciable controversy exists between the parties hereto.

25  **PARTIES**

26        12.    Plaintiff UNITE THE PARKS ("UTP") is a non-profit organization located in

27  Mariposa and Los Osos, California.  Its mission is to protect and interconnect biologically

28  important landscapes for wildlife and for people, for all time.  UTP's most immediate goal is to

1   preserve the federal land between Yosemite and Kings Canyon National Parks and to create the

2   Range of Light National Monument.  UTP's primary focus area is the Sierra National Forest and

3   the BLM lands in the vicinity of the forest.  To support that goal, UTP has four program areas: (1)

4   grassroots campaigning and lobbying (2) litigation as related to the Pacific fisher, (3) education

5   via a college internship program, and (4) education via an at-risk youth summer leadership

6   program in the Sierra Nevada.  UTPs' rural members reside in Mariposa, Madera, Fresno,

7   Tuolumne, El Dorado, Mono and Inyo Counties, and its urban members are located in the Bay

8   Area and Southern California.  UTP's long-term overarching goal is to create interconnected

9   habitat refuges for wildlife and recreational areas and parks for people in the Sierra Nevada and

10  across the state and nation.  To achieve these goals, UTP has been actively engaged in advocating

11  for the conservation of Pacific fisher on the Sierra and Sequoia National Forests and for the

12  curtailment of logging projects and activities that may affect this species.

13          13.     Plaintiff SEQUOIA FORESTKEEPER ("SFK") is a non-profit corporation residing

14  in Kernville, California.  Its mission is to protect and restore the ecosystems of the Southern Sierra

15  Nevada, including, but not limited to, the Giant Sequoia National Monument, Sequoia National

16  Forest, and Mountain Home State Forest through monitoring, enforcement, education, and

17  litigation.  Sequoia ForestKeeper's members, many of whom reside in local areas including Kern,

18  Tulare, Fresno, and Kings Counties, and others who visit from across the country, use and

19  continue to use the national forests of the Southern Sierra Nevada for activities such as hiking,

20  bird and animal watching (including the endangered Pacific fisher), aesthetic enjoyment, quiet

21  contemplation, fishing, scientific study, and to improve their health, including the exact tracts of

22  the lands and waters that are now planned for logging and vegetation management in the Sequoia

23  and Sierra National Forests.  Many of its members also have been actively involved in formulating

24  management policies for public lands and preserving local areas, including participating in

25  revising the Sequoia National Forest plan, the establishment and development of the Giant

26  Sequoia National Monument, and the protection of wildlife habitat including that of the Pacific

27  fisher.

28

14.     Plaintiff EARTH ISLAND INSTITUTE ("EII") is a nonprofit corporation organized under the laws of the State of California.  EII is headquartered in Berkeley, California.  EII is a membership organization with over 15,000 members in the U.S., over 3,000 of whom use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual, and other purposes.  EII's mission is to develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment.  Through education and activism, these projects promote the conservation, preservation and restoration of the earth.  One of these projects is the John Muir Project—whose mission is to protect all federal public forestlands from commercial exploitation that undermines and compromises science-based ecological management.  John Muir Project offices are in San Bernardino County, California.  EII's John Muir Project and EII members actively participate in governmental decision-making processes with respect to national forest lands in California and rely on information provided through the NEPA processes to increase the effectiveness of their participation.  EII's members include individuals who regularly use and continue to use public lands within the Southern Sierra Nevada National Forests – including the exact tracts of lands in the Sierra, Sequoia, and Stanislaus National Forest areas proposed for logging – for scientific study, recreational enjoyment, aesthetic beauty, nature photography, and wildlife observation.  These members' interests will be irreparably harmed by the planned logging and vegetation management activities, as they will no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants, especially the endangered Pacific fisher.

15.     This suit is brought by UTP, EII, and SFK on behalf of themselves and their adversely affected members and staff.  Plaintiffs and their members' present and future interests in, and use of, the Sierra, Sequoia, and Stanislaus National Forest areas planned for logging and vegetation management actions in Pacific fisher habitat are and will be directly and adversely affected by the agencies' impending actions.  Those adverse effects include, but are not limited to: (1) impacts to native plants and wildlife and their habitats—especially those of the Pacific fisher— within and around the Project areas from logging and vegetation management; (2) reduction and

impairment of recreation opportunities; (3) impairment of aesthetic values of forest lands, trails, and landscapes caused by Defendants' logging and vegetation management; and (4) loss of scientific study and viewing opportunities with regard to wildlife in areas proposed for logging and vegetation management.  In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands.

16.     Defendants' failure to comply with the requirements of the ESA, NEPA, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, when authorizing and implementing the various logging and other "vegetation management" actions at issue in this lawsuit has caused and is causing actual and imminent harm to Plaintiffs' interests, as described above, and to the SSN fisher that they seek to protect.  Plaintiffs rely on USFS and FWS to comply with the procedural and substantive requirements of these laws for the protection and conservation of the SSN fisher and its habitat.  A favorable decision by the Court in this case will redress the actual and imminent injury to Plaintiffs and the harm to the SSN fisher and its habitat. A court order directing USFS and FWS to comply with the ESA and NEPA could result in a substantial change to the various activities to minimize or avert harm to Plaintiffs' members and the SSN fisher from the logging, vegetation management activities, and destruction of fisher habitat caused by Defendants' continuing actions.

17.     Defendant UNITED STATES FOREST SERVICE is a federal agency within the U.S. Department of Agricultural which manages federal public lands within the Sierra, Sequoia, and Stanislaus National Forests and which has authorized at least 45 management projects that are the subject of a Programmatic Biological Opinion at issue in this case.  USFS is responsible for ensuring that all resource management decisions on these lands comply with applicable laws and regulations.

18.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the U.S. Department of the Interior which is charged with administration of the ESA and which issued the Programmatic Biological Opinion and Incidental Take Statement and

1   Amended Programmatic Biological Opinion at issue in this case.  FWS is responsible for ensuring

2   that its opinions and authorizations comply with the ESA.

3                    **STATUTORY AND REGULATORY FRAMEWORK**

4   **A.      The Endangered Species Act**

5          19.      Recognizing that certain species of plants and animals "have been so depleted in

6   numbers that they are in danger of or threatened with extinction," Congress enacted the ESA both

7   "to provide a means whereby the ecosystems upon which endangered and threatened species

8   depend may be conserved, [and] to provide a program for the conservation of such endangered

9   species and threatened species."  16 U.S.C. § 1531.  The ESA reflects "an explicit congressional

10  decision to afford first priority to the declared national policy of saving endangered species."

11  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  "The plain intent of Congress in enacting

12  this statute was to halt and reverse the trend toward species extinction, whatever the cost."  *Id.* at

13  184.  The ESA "represent[s] the most comprehensive legislation for the preservation of

14  endangered species ever enacted by any nation."  *Id.* at 180.  The ESA vests primary responsibility

15  for administering and enforcing the statute in connection with terrestrial species with the Secretary

16  of the Interior, who has delegated this responsibility to FWS.

17         20.      Under the ESA, a species may be listed as endangered or threatened.  An

18  endangered species – a status which is reserved for species in the most perilous condition – is one

19  that is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. §

20  1532(6).

21         21.      Section 9 of the ESA makes it unlawful for any person to "take" an endangered

22  species without express authorization from FWS.  16 U.S.C. § 1538(a)(1).  "Take" means "to

23  harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

24  any such conduct." 16 U.S.C. § 1532(19).  The term "harm" is further defined by FWS regulations

25  to encompass habitat modification or degradation that injures an endangered species by

26  significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering, *see*

27  50 C.F.R. § 17.3, and "harass" is defined as "an intentional or negligent act or omission which

28  creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly

1  disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or

2  sheltering." *Id.*

3  22.   Section 7(a)(1) of the ESA directs all federal agencies, in consultation with the

4  Secretary of the Interior, to "utilize their authorities in furtherance of the purposes of [the ESA] by

5  carrying out programs for the conservation of [listed] species."  16 U.S.C. § 1536(a)(1).

6  "Conservation" means "to use and the use of all methods and procedures which are necessary to

7  bring any endangered species … to the point at which the measures provided pursuant to this

8  chapter are no longer necessary."  *Id.* 17 § 1532(3).

9  23.   Section 7(a)(2) of the ESA requires all federal agencies to "insure that any action

10  authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued

11  existence of any endangered species."  16 U.S.C. § 1536(a)(2).  As defined by the ESA's

12  implementing regulations, an action will cause "jeopardy" to a listed species if it "reasonably

13  would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival

14  and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution

15  of that species."  50 C.F.R. § 402.02.

16  24.   To carry out this section 7(a)(2) obligation, an action agency must engage in

17  consultation with FWS *before* undertaking any action that may have direct or indirect effects on

18  listed species in order to evaluate the impact of the proposed action.  16 U.S.C. § 1536(a).  FWS

19  has defined the term "action" for the purposes of section 7 broadly to mean "all activities or

20  programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies,"

21  50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control."  *Id.* § 402.03.

22  25.   In consultation, FWS must "use the best scientific . . . data available" in evaluating

23  the effects of the proposed action on listed species.  16 U.S.C. § 1536(a)(2).  The result of a formal

24  consultation is the preparation of a biological opinion ("BO") by FWS, which is a compilation and

25  analysis of the best available scientific data on the status of the species and how it would be

26  affected by the proposed action.  When preparing a BO, FWS must: (1) "review all relevant

27  information;" (2) "evaluate the current status of the listed species;" and (3) "evaluate the effects of

28  the action and cumulative effects on the listed species or critical habitat."  50 C.F.R. § 402.14(g).

1    As such, a BO must include a description of the proposed action, a review of the status of the

2    species and critical habitat, a discussion of the environmental baseline, and an analysis of the

3    direct and indirect effects of the proposed action and the cumulative effects of reasonably certain

4    future state, tribal, local, and private actions.  *Id.*

5           26.    As part of consultation, FWS must independently analyze whether the proposed

6    action will reduce the likelihood of recovery of the list species, separate from its survival.  50

7    C.F.R. § 402.02; *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 387 F.3d 968, 1070

8    (9th Cir. 2004); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 933 (9th Cir.

9    2008).

10          27.    If FWS determines that the proposed action is not likely to jeopardize the continued

11   existence of listed species or adversely modify critical habitat but will nevertheless result in the

12   incidental take of listed species, then FWS will provide the action agency with a written Incidental

13   Take Statement ("ITS").  The ITS must specify the "impact of such incidental taking on the

14   species" and "any reasonable and prudent measures that [FWS] considers necessary or appropriate

15   to minimize such impact" and must set forth "the terms and conditions . . . that must be complied

16   with by the [action] agency . . . to implement [those measures]."  16 U.S.C. § 1536(b)(4).

17          28.    Where a BO has been issued and "discretionary Federal involvement or control

18   over the action has been retained or is authorized by law," the action agency is required to

19   reinitiate consultation with FWS "[i]f new information reveals effects of the action that may affect

20   listed species or critical habitat in a manner or to an extent not previously considered," or "the

21   identified action is subsequently modified in a manner that causes an effect to the listed species . .

22   . that was not considered in this programmatic biological opinion."  50 C.F.R. § 402.16(a)(2)-(3).

23   The ESA provides that agencies must hold action in abeyance until any legally required

24   consultation is complete.  Section 7(d) of the ESA prohibits an action agency from making "any

25   irreversible or irretrievable commitment of resources with respect to the agency action which has

26   the effect of foreclosing the formulation or implementation of any reasonable and prudent

27   alternative measures which would not violate [Section 7] (a)(2)."  16 U.S.C. § 1536(d).  "This

28   prohibition . . . continues until the requirements of section 7(a)(2) are satisfied."  50 C.F.R. §

402.09.  The purpose of this requirement is to ensure that the status quo will be maintained during the consultation process.  *See Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir.1992).

**B.      The National Environmental Policy Act**

29.      Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321.

30.      NEPA has two fundamental purposes:  (1) to guarantee that, before taking an action, federal agencies take a "hard look" at the consequences of that action to ensure that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of  that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

31.      To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement ("EIS").  The EIS must define the purpose and need for the project, must describe the proposed action and the existing environmental setting, must evaluate adverse direct, indirect, and cumulative environmental effects of the proposed action, and must explore alternatives to and mitigation measures for the proposed action.  *See, e.g., City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1378 (9th Cir. 1998).

32.      To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the acting agency may first prepare an Environmental Assessment

("EA").  An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS.   If the agency concludes that a project may have significant impacts on the environment, it must prepare an EIS.   If the EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impact."  Even an EA, however, must consider the action's cumulative impact on the environment, which is the impact that results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions.  *See, e.g., Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895 (9th Cir. 2002).

33.     The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  To satisfy this obligation, agencies must take a "hard look" at a project's environmental impacts – essentially, "a discussion of adverse impacts that does not improperly minimize negative side effects."  *Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006).

34.     Consideration of synergistic or cumulative effects between different projects and environmental factors is a key part of the agency's determination for "significant" environmental impacts, which inherently "includes considerations of both the context and the intensity of the possible effects."  *Bark v. United States Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020).  Context "delimits" the scope of the agency's action and review.  *Id.*  The cumulative analysis requirement is essential to ensure agencies do not "impermissibly subject the decisionmaking process contemplated by NEPA to the tyranny of small decisions."  *Kern v. BLM*, 284 F.3d 1062, 1078 (9th Cir. 2002).

35.     The "heart of the environmental impact statement" is its analysis of alternatives to the agency's proposed action.  *See, e.a., League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012).  An EIS also must discuss mitigation measures for the proposed action "'with sufficient detail to ensure that environmental

consequences have been fairly evaluated,'" including by addressing whether the measures "can be effective" at reducing environmental impacts. *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (quoting *Robertson*, 490 U.S. at 348).

36.     A federal agency must conduct supplemental environmental review if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii).  Agencies must "continu[e] to maintain a 'hard look' at the impact of agency action when the 'new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered.'" *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014) (quoting *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 373-74, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989).

## C.     Administrative Procedure Act

37.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides for judicial review of agency action.  Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in the record." *Id.* § 706(2)(A).  An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

38.     When reviewing agency action under the APA, a court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Id.* at 43.  The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

39.     Under the APA, a reviewing court must also set aside agency action, findings, and conclusions found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D). Additionally, reviewing courts may "compel agency action unlawfully withheld or unreasonably delayed."  *Id.*§ 706(1).

## FACTUAL BACKGROUND

### A.     Listing of SSN Fisher as Endangered

40.     A relative of minks and otters, the Pacific fisher is a medium-size carnivorous mammal – about the size of a house cat – that once roamed the West Coast from British Columbia to Southern California.  85 Fed. Reg. 29,532, 29,537 (May 15, 2020).

41.     The isolated Pacific fisher population that occupies the southern Sierra Nevada Mountains today is critically imperiled.  Population estimates for the SSN fisher, based on habitat modeling from 2011 and earlier, suggest that as of 2012, there were somewhere between 100 and 500 individuals fishers, but likely less than 300 adults.  *See* 85 Fed. Reg. 29,532, 29,563 (May 15, 2020).  These estimates were developed more than ten years ago, before an extraordinary drought and subsequent tree mortality from drought stress, native beetles, and several major wildfires altered the landscape; these changes resulted in a reduction of essential fisher denning and resting habitat by more than 50 percent, and continued USFS logging between 2012 and 2021 caused further degradation or total loss of a large amount of this still-suitable fisher habitat.  Accordingly, actual population numbers today, as well as survival and recovery trajectories, are likely significantly lower than in 2011.

42.     The best available science concludes that for terrestrial mammals like the Pacific fisher, the minimum viable population size to avoid a significant risk of extinction over several decades is 3,876 individuals.  *See* L.W. Traill et al., "Minimum viable population size: a meta-analysis of 30 years of published estimates," Biological Conservation 139: 159-166 (2007).  This conclusion is based on a massive meta-analysis of 95 scientific studies spanning three decades. Accordingly, even if the upper estimate of 500 individual SSN fishers in 2011 was accurate at that time and even if the subsequent loss of suitable habitat did not reduce the population, the estimated population is 87 percent lower than the minimum viable population needed to avoid a

1    significant risk of extinction in the near future.  If the true current population size is closer to 100

2    to 200 individuals, including juveniles and subadults, the population is 95 to 97 percent lower than

3    the minimum viable population.

4         43.    Concerned members of the public have attempted for decades to obtain ESA

5    protection for the Pacific fisher.  In 1990, over a dozen organizations petitioned FWS to list the

6    Pacific fisher as an endangered species, but FWS denied that petition.  56 Fed. Reg. 1159 (Jan. 11,

7    1991).  Three years later, other organizations again petitioned to list the species as threatened, and

8    FWS again denied the petition, but conceded that "available information indicates that fishers have

9    experienced declines in the past, and may be vulnerable to the removal and fragmentation of

10   mature/old-growth habitat and incidental trapping pressure."  61 Fed. Reg. 8016-17 (Mar. 1,

11   1996).  Following litigation by concerned citizens, FWS finally agreed in 2004 that listing of the

12   species was "warranted" under the ESA listing criteria, but "precluded" by the agency's higher

13   listing priorities.  69 Fed. Reg. 18,770 (Apr. 18, 2004).  For the next nine years, FWS continued to

14   make the same "warranted but precluded" determination annually.  *See* 79 Fed. Reg. 60,419,

15   60,423 (Oct. 7, 2014).

16        44.    After further litigation, FWS finally proposed to list the Pacific fisher (using the

17   nomenclature "West Coast fisher") as a "distinct population segment" in 2014.  79 Fed. Reg.

18   60,419 (Oct. 7, 2014).  The proposed listing explained that "[f]isher populations are fragmented

19   and greatly reduced from their historical range in the West Coast DPS area."  *Id.* at 60,428.  FWS

20   identified "the main threats to the West Coast DPS" as "habitat loss from wildfire and vegetation

21   management; toxicants (including anticoagulant rodenticides); and the cumulative and synergist

22   effects of these and other stressors acting on small populations."  *Id.* at 60,420.  FWS further

23   explained that "researchers have identified the greatest long-term risk to fishers as the isolation of

24   small populations and the higher risk of extinction due to stochastic events."  *Id.* at 60,434.

25   Finally, FWS indicated that "[f]or the habitat-related stressors, the cumulative and synergistic

26   impacts are particularly problematic in the SSN because of the narrow band of habitat that

27   comprises SSN and its small population size."  *Id.* at 60,435.

28

45.     Between 2012 and 2016, agency and other biologists developed a "Southern Sierra Nevada Fisher Conservation Strategy" to guide the conservation and recovery of the Pacific fisher in the Southern Sierra Nevada based on available fisher population and habitat vegetation data. Finalized in February 2016, this Conservation Strategy was built primarily around increasing the carrying capacity within seven identified fisher core habitat areas and increasing dispersal potential between these core areas (through six identified linkage areas) to facilitate the reproductive success and expansion of the population.  The Conservation Strategy defined core areas as large "contiguous areas of fisher habitat within which fishers can establish home ranges and comingle as a population, generally separated by unsuitable habitat areas."  It further explained that "[w]ithin core areas, fishers need foraging, resting, and denning habitats, of which denning habitat is most limited.  Dispersal habitat in linkage areas facilitates inter-core movements."

46.     In March 2016, FWS issued a Final Species Report for the SSN Fisher which affirmed, among other things, that the most critical limiting factor for fishers is the availability of suitable habitat elements to provide for successful reproduction and rest sites.  FWS, "Final Species Report, Fisher (*Pekania pennanti*), West Coast Population" at 90 (Mar. 2016).  Such denning and resting habitat occurs in low- to mid-elevation coniferous and mixed conifer and hardwood forests with characteristics of mid- and late-successional forests, including diverse successional stages, moderate to dense forest canopies, large-diameter trees, coarse downed wood, and singular features of large snags, tree cavities, and deformed trees. 85 Fed. Reg. at 29,538. Many scientific studies confirm the fact that available denning and resting habitat a limiting factor for the species and that such habitat may take decades or centuries to develop.

47.     Despite the small size of the SSN fisher population and the ongoing loss of its suitable habitat, FWS abruptly and inexplicably reversed course in 2016 and withdrew the proposed listing of the "West Coast" fisher.  81 Fed. Reg. 22,710 (Apr. 18, 2016).  Several conservation organizations challenged that decision, and a federal court subsequently found it to be arbitrary, capricious, and unsupported by the evidence.  *See Ctr. For Biological Diversity v.*

1  *U.S. Fish and Wildlife Serv.*, 342 F. Supp. 3d 968 (N.D. Cal. 2018) (ordering FWS to produce a

2  new listing decision by March 22, 2019).

3        48.     In 2019, FWS complied with the court order by reinstating its earlier proposal to

4  list the "West Coast Distinct Population Segment" of the fisher as a "threatened" species.  84 Fed.

5  Reg. 60,278 (Nov. 7, 2019).  In this proposed rule, FWS stated that that SSN fisher population

6  consisted of "a low of 100 to a high of 500 individuals," but explained that these estimates were

7  "based on habitat conditions for fishers in the Sierra Nevada that predate the ongoing, large-scale

8  tree mortality event in this geographic area that began in approximately 2010."  *Id.* at 60,286.

9  FWS further explained that the tree mortality event "is affecting many of the key components of

10  fisher habitat such as complex forest canopy structure and connected closed-canopy forest

11  conditions."  *Id.*  As these statements demonstrate, the SSN fisher population estimates based on

12  habitat conditions from 2011 and before do not accurately reflect current conditions or population

13  numbers.

14        49.     In February 2020, many of the scientists who had developed the 2016 Conservation

15  Strategy issued a new "Southern Sierra Nevada Fisher Conservation Strategy Interim

16  Recommendations" document in the wake of the recent dramatic landscape changes.  That

17  document noted that "[i]mplementing the fisher conservation strategy was immediately derailed

18  by this dramatic shift in habitat conditions as well as by the lack of an updateable vegetation

19  database for planning conservation actions and monitoring habitat changes due to forest

20  management and other factors."  Interim Recommendations at 4.  This document concluded that

21  persistence of the SSN fisher "is now at elevated risk due to recent habitat changes and increased

22  population fragmentation that appears evident following the recent drought-related tree mortality

23  and high-intensity wildfires."  *Id.* at 6.  USFS has often exacerbated these risks by further habitat

24  removal due to post-disturbance logging and clearcutting.

25        50.     The Interim Recommendations provided, for the first time, some preliminary

26  evaluation of habitat changes over the first half of the 2010 decade.  The document stated that

27  "[w]hile we do not yet have complete post-drought vegetation information, the limited sources

28  available suggest that almost 40% of the foraging habitat in the fisher conservation area has been

lost through the cascading effects of drought, insect infestation, fire, and subsequent tree mortality. . . Possibly more significant than simple acreage, the number of habitat patches went from 74 to 558 and the average patch size went from over 31,500 acres to 2,600 acres . . . , indicating severe fragmentation. . . . These estimates do not include fires or other disturbances that occurred after 2016, such as the Railroad Fire." Interim Recommendations at 8-9.

51.     With respect to critical denning habitat, the Interim Recommendations document stated that "[a] similarly dramatic loss has likely occurred in the highest quality habitat, characterized as high-quality denning habitat in the assessment area. Prior to the widespread tree mortality observed between 2014 and 2016, the [Conservation Strategy] estimated that 805,000 acres . . . of denning habitat existed in the southern Sierra Nevada. Using the same model parameters with updated (2016) canopy cover data, we now estimate that 493,000 acres . . . remain, a loss of 39%. The number of denning habitat patches has dropped from 254 to 172, and the average size of these patches has dropped from 3169 acres to 2868 acres. Essentially, this translates to a loss of many of the smaller patches and a shrinking of the larger ones . . . . Further analysis will be necessary to refine our understanding of these trends, once updated and complete vegetation data are available effects of drought, insect infestation, fire, and subsequent tree mortality." *Id.* at 9.

52.     The Interim Recommendations concluded that due to the "extreme habitat loss and fragmentation that occurred between 2014 and 2016, the landscape no longer reflects" the pattern of seven core areas and six key linkages identified in the 2016 Conservation Strategy. *Id.* at 10. In particular, "[c]ore areas have been fragmented and shrunk, and former linkage areas may now represent barriers to movement." *Id.* The authors explained that "[f]urther analysis will be necessary . . . once updated and complete vegetation data are available." *Id.*

53.     With respect to linkage corridors, the Interim Recommendations concluded that "given the higher level of habitat fragmentation, finding suitable territories by dispersing female fishers is more uncertain" and recommended that "a detailed population viability analysis designed to identify critical core areas, corridors, and restoration opportunities" should guide future conservation of the species. *Id.* at 22.

54.     On May 15, 2020, FWS issued a final decision, listing the SSN fisher as a distinct population segment ("DPS") of the Pacific fisher based on its geographic isolation and genetic uniqueness and determining that the SSN fisher meets the definition of "endangered" species (rather than a "threatened" species as previously proposed), meaning that the DPS is "in danger of extinction throughout all or a significant portion of its range."  *See* 85 Fed. Reg. 29,532 (May 15, 2020).

55.     In reaching its final listing decision, FWS stated that "[o]f particular significance . . . were loss and fragmentation of habitat resulting from high-severity wildfire and wildfire suppression (i.e., loss of snags and other large habitat structures on which the species relies), climate change, and tree mortality from drought, disease, and insect infestations."  85 Fed. Reg. at 29,532.  Also of significance were "threats related to potential direct impacts to individual fishers (e.g., increased mortality, decreased reproductive rates, increased stress/hormone levels, alterations in behavioral patterns)."  *Id.*  FWS concluded that "[t]hese factors are resulting in a cumulative effect to such a degree that the best available information indicates the Southern Sierra Nevada DPS of fisher meets the definition of an endangered species."  *Id.*

56.     The May 2020 listing decision explained that small populations like the SSN fisher are vulnerable to a rapid decline in their numbers and to localized extinction due to three factors: (1) loss of genetic variability (*e.g.*, inbreeding depression, loss of evolutionary flexibility); (2) fluctuations in demographic parameters (*e.g.*, birth and death rates, population growth rates, population density); and (3) environmental stochasticity or random fluctuations in the biological (*e.g.*, predation, competition, disease) and physical (*e.g.*, wildfire, drought events, flooding) environment.  85 Fed. Reg. at 29,545.  According to FWS, the SSN fisher exhibits all three of these small population vulnerabilities, including (1) loss of large contiguous areas of historical habitat, including a 39 percent loss of its habitat over the past five years, in combination with restriction of the species to forested habitats that have been lost or modified due to timber-harvest practices, large, high-severity wildfires whose frequency and intensity are in turn influenced by the effects of climate change, and increasing forest fuel density from fire suppression and a lack of low-severity fire over the recent long term; (2) dependence on specific elements of forest structure

1   that may be limited on the landscape, including microsites for denning and resting; and (3)

2   susceptibility to injury or mortality due to predation from co-occurring larger predators.  *Id.* at

3   29,566-67.  "Each of these vulnerabilities may separately, or together, influence the magnitude of

4   other threats."  *Id.*

5   **B.     Issuance of Programmatic Biological Opinion and Incidental Take Statement**

6          57.     The listing of the SSN fisher on May 15, 2020 required USFS to engage in

7   consultation with FWS for projects that may affect the species.  On May 19, 2020, USFS initiated

8   consultation with FWS, initially for 40 already-approved projects, and provided a Programmatic

9   Biological Assessment ("2020 PBA").  The 2020 PBA stated that the current range of the Pacific

10  fisher represents a 50 percent reduction from the presumed historical range and that the current

11  SSN fisher population "almost certainly numbers <500 total individuals (Spencer et al. 2011) and

12  probably <300 adult fishers and has been stable over the past decade based on occupancy

13  estimates from the regional monitoring program (Zielinski et al. 2013a, Zielinski and Gray 2018)."

14  2020 PBA at 16.  USFS's analysis and conclusions in the 2020 PBA were based on the population

15  and trend assumptions contained in these statements.

16         58.     The "Spencer et al. 2011" study referenced in the 2020 PBA is titled "Using

17  occupancy and population models to assess habitat conservation opportunities for an isolated

18  carnivore population."  This study assessed SSN fisher population status using "a spatially explicit

19  population model coupled with a fisher probability of occurrence model."  The study authors used

20  fisher survey data collected between 2002 and 2006 and existing (pre-2011) habitat/vegetation

21  estimates as inputs into the fisher occurrence model.  They concluded that the SSN carrying

22  capacity – the population size that an environment can support – is between 73 and 147 adult

23  females.  Assuming a 1:1 adult sex ratio, the authors estimated an adult population of 146 to 294

24  individuals, but concluded that "this probably over-estimates the number of males."  The result of

25  this modeling evaluation accorded reasonably well with the author's extrapolation of 53 to 83

26  adult females from another marking study.  The authors noted that their simulation results "were

27  run on a static habitat map" and that, "[i]n reality, vegetation, habitat value, and carrying capacity

28  are dynamic due to succession, fires, and other factors."  For this reason, subsequent events that

1  reduce habitat value, like those that occurred after 2011, will affect population and carrying

2  capacity.

3      59.      The authors of Spencer et al. 2011 also explained that "[t]otal above-ground

4  biomass of trees was the strongest biotic predictor of fisher habitat value in our models . . . and it

5  should correlate closely with forest structure variables found by numerous field studies to predict

6  fisher habitat election at fine scale: large trees, dense, multi-storied canopies, and abundant dead-

7  wood structures."  Thus, "disturbances that decrease forest biomass or fragment areas of high

8  biomass will have adverse effects on fishers."  While "total tree biomass tends to be a good

9  predictor of fisher habitat quality," "[v]egetation management that promotes accumulation of

10  forest biomass but removes important constituent elements, such as dead-wood structures,

11  deformed trees, or trees with cavities may be detrimental in ways our landscape-scale correlation

12  model cannot account for."

13      60.      The "Zielinski et al. 2013a" study referenced in the 2020 PBA is titled "Estimating

14  Trend in Occupancy for the Southern Sierra Fisher *Martes pennanti* Population."  The authors of

15  this study indicate that the size of the SSN fisher population "is unknown, but various estimates

16  have ranged from 100 to 400 individuals (Lamberson et al. 2000; Spencer et al. 2011).  This small

17  number is of concern, especially because the population is effectively isolated from the nearest

18  population in northwestern California."  The Zielinski et al. 2013a study is a monitoring

19  occupancy study that sampled for the presence or absence of SSN fishers at 233 core sites,

20  although for financial and logistical reasons, not every site was monitoring every year; on average,

21  139.5 sites were sampled each year and the average site was sampled 5 of the 8 years.  Sampling

22  "was designed to detect at least a 20% decline . . . in the first 10 [years] of sampling (equivalent to

23  a 2.45% annual decrease)."  As the authors explained, "[t]he methods to detect presence or

24  absence of fishers can be used to determine geographic distribution and occupancy, but they do

25  not directly measure abundance or provide estimates of reproduction or survival."  Thus, the

26  study's conclusions are premised on "the key assumption that changes in occupancy reflect

27  changes in population size."

28

Case No. _____
COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

61.     Given the study design, Zielinski et al. did not set out to provide and did not provide any evidence or results that estimate population size or survival.  Instead, the authors reported "the results of 8 [years] of sampling and analysis to determine occupancy and trends in occupancy for fishers in the southern Sierra Nevada from 2002 to 2009."  Using a "best fit" approach, the authors concluded that the data "revealed no evidence for a change or trend in fisher occupancy estimates over the 8-y period."  While one area showed a downward trend, it was not statistically significant.  For this reason, the authors concluded that "we have no evidence that the fisher population, as indexed by our measure of occupancy, has changed in the southern Sierra Nevada, or any zone therein, from 2002 to 2009."  Thus, this study measured occupancy trends prior to 2010 and provides no evidence of population size, occupancy, or persistence today, after a decade in which vital fisher denning and resting habitat has been reduced by more than 50 percent.

62.     The "Zielinski and Gray 2018" study referenced in the 2020 PBA is titled "Using routinely collected regional forest inventory data to conclude that resting habitat for the fisher (Pekania pennanti) in California is stable over ~20 years."  The authors explained that cavities or chambers in large live and dead trees provide resting habitat this is "considered one of the critical elements for the maintenance and of fisher populations" and noted that "these features may take hundreds of years to develop."  Accordingly, "there is a premium on information about the amount and distribution of resting habitat because it can be degraded at a much higher rate than it develops."  This study was designed, therefore, to test the efficacy of using Forest Inventory and Analysis vegetation data to predict fisher resting habitat – but notably, not denning habitat – in the southern Sierra Nevada and northwestern California.  Using three data sets with mean assessment years of 1998, 2003, and 2010, the study found no overall change in resting habitat over this period in the southern Sierra Nevada, although the Sierra and El Dorado National Forests experienced a decrease and the Sequoia and Stanislaus National Forests experienced an increase.

63.     In discussing these modeling results, Zielinski and Gray stated that the use of a surrogate feature, like fisher resting habitat, is of interest to ecologists as a way to predict population status, and they hypothesized that, "other things being equal," if resting habitat is "stable and sufficiently abundant," the fisher population in the same area "should also be stable, or

at least not decreasing."  The authors caveated their hypothesis by explaining that "[o]f course factors other than resting habitat affect fisher population growth rates . . . so stability in [resting habitat] over time doesn't guarantee that the fisher population will necessarily be spared negative effects nor enjoy positive effects. . . . A stable or increasing trend in resting habitat is a necessary, but not sufficient, condition for determining the health of a fisher population."

64.     As demonstrated in the foregoing paragraphs, the studies cited in the 2020 PBA do not reflect or support the SSN fisher population estimates or trend conclusions stated in the 2020 PBA.  The cited studies rely on presence-absence surveys and predictive modeling based on habitat conditions that predate the dramatic denning/resting habitat reductions from drought, beetles, logging, and wildfires that began in 2012 and continued through 2021.  Given the reduction of over 50 percent of the suitable SSN fisher denning/resting habitat on national forests during the last decade, the outdated habitat data used in these studies does not and cannot accurately measure current population status or predict current survival and recovery trajectories.

65.     Nevertheless, less than a month after the 2020 PBA was produced, FWS issued a Programmatic Biological Opinion ("2020 PBO") and an addendum that covered all 40 initial USFS projects, authorizing incidental take on five of those projects.  A month and a half later, FWS issued a second addendum authorizing another five projects under the 2020 PBO, bringing to 45 the total number of USFS projects authorized through concurrence or consultation.  FWS estimated that as a result of USFS logging and vegetation management activities on the Sierra National Forest, it was reasonably likely that four female adult fishers will be unable to successfully reproduce for one denning season and eight kits will be injured or killed due to den abandonment or increased susceptibility to predation.  Even though many of the projects will be implemented during successive denning seasons, in some cases for up to five total years, FWS did not estimate the resulting take of fishers from USFS logging and vegetation management activities beyond one denning season.

66.     In the 2020 PBO, FWS repeated verbatim the SSN fisher population estimates and supporting studies cited in the 2020 PBA, but then added the critical caveat that "[t]hese estimates predate the 2012-2015 drought and subsequent habitat loss.  An updated population estimate has

1    not been completed; therefore, it is unknown if there have been subsequent changes in the

2    population." 2020 PBO at 29.

3         67.    The denning season for the SSN fisher generally runs from March 1 through June

4    30, during which the Forest Service normally implements a Limited Operating Period ("LOP")

5    when vegetation management activities are prohibited.  Under the 2020 PBO, FWS authorized

6    incidental take during the normal LOP for five projects, permitting USFS to take twelve fishers

7    during that period, including four adult females and eight fisher kits that will not survive.

8         68.    The 2020 PBO and two addenda also authorized 40 additional logging or

9    vegetation management actions that may affect the SSN fisher on the Sierra, Sequoia, and

10   Stanislaus National Forests, concurring with USFS's assertions that these activities are not likely

11   to adversely affect the fisher.  FWS provides little, if any, additional supporting analysis to reach

12   its determination and concurrence on these 40 projects.

13   **C.    Large Fires on the Sierra and Sequoia National Forests During 2020**

14        69.    Subsequent to issuance of the 2020 PBO and the addended 45 USFS projects, the

15   Creek Fire ignited in late summer 2020 and burned roughly 379,895 acres in the Sierra National

16   Forest (https://inciweb.nwcg.gov/incident/7147/), including tens of thousands of acres of SSN

17   fisher habitat, much of which is considered core denning, resting, and foraging habitat.

18        70.    The SQF Complex Fire (or Castle Fire) also ignited in the summer of 2020 and

19   burned roughly 174,178 Acres in the Sequoia National Forest and Sequoia National Park

20   (https://inciweb.nwcg.gov/incident/7048/), including tens of thousands of acres of SSN fisher

21   habitat, much of which is considered core denning, resting, and foraging habitat.

22        71.    To conserve the SSN fisher, the 2016 Conservation Strategy identified seven core

23   habitat areas for protection.  Scientists believe that core areas 1, 2, 3, 4, and 5 are occupied by

24   female fishers, while core areas 6 and 7 constitute suitable but currently unoccupied habitat.  The

25   2020 fires burned in all five occupied SSN fisher core habitat areas 1, 2, 3, 4, and 5.

26        72.    The 2016 Conservation Strategy also identified six linkage areas that connect the

27   seven core areas and allow SSN fisher dispersal.  The 2020 fires burned through these linkages,

28   potentially inhibiting or reducing fisher movement between these cores.  The Creek Fire burned

1   through the linkage areas between Cores 4 and 5 in the Sierra National Forest, and the Sequoia

2   Complex/Castle Fire burned through the linkages between Cores 1 and 3 and Cores 2 and 3 in the

3   Sequoia National Forest.  The compound effects from the 2020 fires and the 2015 Rough Fire on

4   fisher movement between core areas is unknown and has not been assessed by USFS or FWS.

5       73.    After some discussion between Plaintiffs and Defendants regarding the impacts of

6   these massive 2020 fires and the intent of USFS to proceed with the 45 authorized projects,

7   Plaintiffs sent a notice to Defendants of their intent to pursue a citizen suit under ESA section

8   1540(g) if Defendants did not reinitiate consultation in light of dramatic wildfire-caused landscape

9   changes to SSN fisher habitat that were not previously considered in the 2020 PBO.

10      74.    On February 23, 2021, USFS issued an "Amendment to the Programmatic

11  Biological Assessment for the Southern Sierra Nevada DPS of Pacific Fisher" ("2021 PBA").

12  Applying something called "Rapid Assessment of Vegetation Condition after Wildfire" to analyze

13  the potential effects of the fires on fisher habitat, USFS concluded in the 2021 PBA that the 2020

14  wildfires reduced SSN fisher denning habitat by roughly 14 percent and foraging habitat by

15  roughly 15 percent.  Using data from the California Wildlife Habitat Relationship system, the

16  2021 PBA concludes that only 203,845 acres of denning habitat and 195,820 acres of foraging

17  habitat remain on the Sierra and Sequoia National Forests, which collectively include 2,580,618

18  acres.  *Id.* at 4.  The 2021 PBA does not contain any new population monitoring data or viability

19  analysis.  The 2021 PBA also continues to ignore or understate the impact of post-fire logging by

20  inaccurately assuming zero impacts to fishers from the logging, contrary to the best available

21  science, which concludes that burned areas are often selected by fishers for foraging in the absence

22  of logging and that logging removes such habitat.

23      75.    On February 24, 2021, USFS sent a letter to FWS requesting "to reinitiate

24  consultation to update the baseline existing conditions in order to address changes resulting from

25  the two wildfires that occurred within the [SSN fisher habitat] during the 2020 fire season."

26  Despite the dramatic reduction in SSN fisher habitat described in the 2020 Interim

27  Recommendations and the additional reduction in habitat described in the 2021 PBA as a result of

28  the 2020 fires, USFS stated in this letter that "we believe that the changes to the baseline caused

1   by these fires are not so significant as to legally require re-initiation of consultation. . . .

2   Nonetheless, we have decided to reinitiate consultation in an abundance of cautions and so that the

3   [Programmatic Biological Assessment and Programmatic Biological Opinion] reflect the latest

4   information."

5      76. On March 12, 2021, FWS issued a revised Programmatic Biological Opinion

6   ("2021 PBO") in response to USFS's request to reinitiate ESA consultation.  The analysis in the

7   2021 PBO is "based largely on California Wildlife Habitat Relationships" system, the core of

8   which is a database that relates species to each supporting habitat type.  FWS described these data

9   as "imperfect at best," but "the only consistent vegetation information currently available across

10   the fisher's range."  *Id.* at 10.  The 2021 PBO then repeats verbatim the outdated statements from

11   the 2020 PBA and the 2020 PBO about the status of the SSN fisher population based on pre-2011

12   habitat information, but again confirms that "an updated population has not been completed;

13   therefore, it is unknown if there have been subsequent changes in the population."  *Id.* at 32.

14      77. The scientific studies cited by the 2021 PBO do not cite current or updated

15   population estimates that take account of the dramatic reduction in SSN fisher habitat over the past

16   decade, and the 2021 PBO itself does not contain any new population monitoring data or viability

17   analysis.

18      78. The 2021 PBO suggests that actual monitoring for SSN fishers on the Sierra

19   Nevada National Forests, which began in 2002, continues regardless of current perceived habitat

20   suitability.  *Id.* at 37.  Plaintiffs are informed and believe, and on that basis allege, that funding for

21   at least some of this monitoring has been discontinued.

22      79. In evaluating the effects of the action, the 2021 PBO concedes that logging and

23   other USFS vegetation management activities disrupt fisher breeding and foraging behavior and

24   reduce habitat quality, resulting in loss of denning habitat and reproductive success, increased

25   exposure to predation and decrease in prey, and adverse effects on the species' ability to travel

26   distances between safe sites.  FWS suggests, however, that these adverse "short-term" effects may

27   be countered by "potential positive effects" from "vegetation management" that "can increase

28   resilience of large tree clumps within and adjacent to high value habitat."  *Id.* at 40.  The 2021

Case No. _____

1   PBO does not cite any scientific evidence to support this speculative theory about long-term

2   positive effects, and none exists.

3        80.    With respect to effects of proposed USFS projects on recovery, the 2021 PBO

4   repeats the same speculative and scientifically unsupported theory that "[w]hile some of the USFS

5   projects appended to this Programmatic Biological Opinion may result in short-term impacts to

6   fisher (through habitat modification or noise disturbance, for example), we expect that these short-

7   term impacts are outweighed by the long-term benefits of these projects," which FWS describes as

8   "increasing resilience of fisher denning, foraging, and dispersal habitat." *Id.* at 47.  The 2021 PBO

9   does not cite any scientific evidence to support this speculative theory about long-term positive

10   effects, and none exists.

11       81.    Moreover, this speculative theory does not account for important aspects of the

12   wildfire issue.  The science shows that "fuel reduction treatments" that create openings in the

13   canopy and/or reduce forest canopy actually increase forest temperatures, reduce forest moistures,

14   increase fresh-oxygen availability and reduce wind resistance in the forest-fire zone, thereby

15   potentially increasing fire intensity, severity, and spread.

16       82.    For example, recent work by A.L. Atchley et al., "Effects of fuel spatial

17   distribution on wildland fire behavior," Int'l Journal of Wildland Fire (2021) demonstrates that

18   fuels-reduction practices that fail to properly consider atmospheric motions induced by fire, like

19   those proposed by USFS and relied on by FWS in the 2020 and 2021 PBOs, can actually reduce

20   resiliency, contrary to USFS claims.  By neglecting the role that fire-induced buoyancy plays in

21   replenishing fresh oxygen and driving local winds, the unproven USFS theory about fuel treatment

22   and vegetation management creating long-term forest resiliency is incomplete, ignores basic

23   physics, and is potentially dangerous.  *See, e.g.*, J.L. Coen et al., "Computational modeling of

24   extreme wildland fire events: a synthesis of scientific understanding with applications to

25   forecasting, land management, and firefighter safety," Journal of Computational Science

26   (2020).  Numerous additional studies, including the largest scientific analysis of this question ever

27   conducted (spanning the entire western US, and analyzing three decades of data, *i.e.*, Bradley et

28   al., "Does increased forest protection correspond to higher fire severity in frequent-fire forests of

the western United States?" Ecosphere (2016)), provide further support to the conclusions of Atchley et al., and similarly find that logging activities, including commercial thinning and post-fire logging, tend to increase, not decrease, fire severity. This research has been ignored by USFS and FWS in their PBA and PBO assessments.

83. Despite the reduction of nearly 55 percent of suitable SSN fisher habitat on national forest lands since the last habitat-based population estimates were developed, and despite the absence of any new population evaluation or analysis, the 2021 PBO concluded that proposed USFS actions across the range of the SSN fisher DPS are "not likely to jeopardize the continued existence of [the species]" and that the "project-related effects to the species, when added to the environmental baseline and analyzed in consideration of all potential cumulative effects, will not rise to the level of precluding recovery or reducing the likelihood of survival of the species." *Id.* at 47-48. This conclusion is based ostensibly on "conservation measures" intended to avoid direct injury, avoid denning season, and protect historically known and potential den trees; the small percentage of USFS lands on which these projects will occur; the "long-term beneficial effects" of logging and other vegetation management on fishers; and continued monitoring fisher distribution and trend information. *Id.* The 2021 PBO does not cite any scientific evidence for its reliance on "long-term beneficial effects" of logging and vegetation management to offset habitat destruction or to support its statement about "continued monitoring" will ensure fisher recovery. And it does not explain how temporal measures designed to avoid direct fisher injury during logging and other management activities that destroy crucial habitat will adequately protect the survival and recovery of the species under the habitat conditions that exist today.

84. Although the 2021 PBO references "USFS projects appended to this Programmatic Biological Opinion," no USFS projects are appended or independently considered, and as the 2021 PBO itself states, "[n]o incidental take is authorized by this programmatic biological opinion for the DPS of the fisher." *Id.* at 49. Accordingly, Plaintiffs are informed and believe, and on that basis allege, that USFS has no ESA concurrence or take authorization under the 2021 PBO to carry out any project in SSN fisher habitat.

1  **D.      USFS Projects that May Affect the SSN Fisher**

2        85.      For the five logging and vegetation management projects that USFS determined in

3  the 2020 PBO are likely to adversely affect the SSN fisher, FWS authorized the incidental take of

4  12 fishers through loss or alteration of denning and foraging habitat during the fisher LOP.  Table

5  1 below identifies these five projects, with hyperlinks to the 2020 project biological assessments:

6  **Table 1.  Projects with Incidental Take of 12 Fishers Authorized by FWS**

7

| Forest | Project Name | Activities | Project Acres* | Fisher Acres Impacted * |
|---|---|---|---|---|
| Sierra | Ferguson Fire Roadside Hazard Tree Removal Project | Hazard tree logging, follow-up prescribed burning | 1500 | 327 |
| Sierra | Railroad Fire Restoration | Hazard tree logging, follow-up pile burning | 1250 | 317 |
| Sierra | Sky Ranch Road System Hazard Tree Abatement Project | Logging of remaining 13,000+ hazard trees | 3241 | 1983 |
| Sierra | Sonny Meadows North and South Project 2018 | Precommercial thinning, hazard tree logging, prescribed burns | 2278 | 2194 |
| Sierra | Musick Vegetation Project | Variety of vegetation treatments, including hazard tree logging | 13238 | 7171 |

15  ***Source of Acreages:  PBO Appendage 1 at 5-6.**

16        86.      USFS recently informed Plaintiffs that the Railroad Fire and Sky Ranch projects

17  have been completed.

18        87.      During June and July 2020, FWS appended 40 additional projects to the 2020 PBO.

19  For these 40 projects, FWS concurred with USFS that the projects may affect, but are not likely to

20  adversely affect the SSN fisher.  FWS did not authorize any USFS activities on these projects

21  during the fisher LOP, but would allow the loss or alteration of fisher denning and foraging

22  habitat.  Tables 2a and 2b below identify these 40 projects, with hyperlinks to 2020 project

23  biological assessments or other project files where those were unavailable:

24  **Table 2a.  Projects that May Affect Fishers – Sequoia National Forest**
     **and Giant Sequoia National Monument (GSNM)**

25

26

| Forest | Project Name | Activities | Project Acres* | Fisher Acres Impacted* |
|---|---|---|---|---|
| Sequoia | Eshom Ecological Restoration Project | Logging, mechanical treatments, and prescribed fire | 5019 | 1019 |

28

| Forest | Project Name | Activities | Project Acres* | Fisher Acres Impacted* |
|---|---|---|---|---|
| Sequoia | Joey Healthy Forest and Fuels Reduction Project | Commercial and hand thinning, hazard tree logging, pile and prescribed burning | 6193 | 698 |
| Sequoia | North Road Hazard Tree Abatement | Hazard tree logging, chipping, piling, and burning | 8980 | 5047 |
| Sequoia | Pier Fire Roadside Hazard Tree Mitigation | Hazard tree logging, mastication, chipping, piling, and burning | 1636 | 1151 |
| Sequoia | Road 25S15 Hazard Tree Project | Hazard tree logging, mastication, chipping, piling, and burning | 576 | 118 |
| Sequoia | Slick Rock Thin and Prescribed Burn Project | Broadcast and/or piling and jackpot burning, incidental hazard tree felling | 896 | 861 |
| Sequoia | Summit Healthy Forest | Hazard tree logging, chipping, piling, and burning | 673 | 469 |
| Sequoia | Trail of 100 Giants Hazard Tree Mitigation Project | Hazard tree logging, pile burning, chipping | 30 | 30 |
| Sequoia/ GSNM | Big Stump/ Redwood Mountain Fuels Restoration | Prescribed fire, hand thinning, fire line construction, pile burning | 3073 | 2485 |
| Sequoia/ GSNM | Bull Run Roadside Hazard Tree Mitigation | Hazard tree logging, pile burning, chipping | 3245 | 633 |
| Sequoia/ GSNM | Hazard Tree Slash Clean-up Project | Removing previously felled material through piling and burning, as biomass, or as wood products | 1789 | 654 |
| Sequoia/ GSNM | Kirkland Plantation Thin Project | Mastication and prescribed fire | 504 | 119 |
| Sequoia/ GSNM | Long Meadow Restoration Project | Install plug structures, rock and vegetation, plant native vegetation | 35 | 35 |
| Sequoia/ GSNM | McKenzie Ranch Project Prescribed Burning | Prescribed fire, hand line construction/maintenance, hazard tree felling | 500 | 431 |
| Sequoia/ GSNM | Revised Frog Project (Frog II Project) | Fuel reduction/ commercial thinning, hazard tree logging | 1258 | 833 |
| Sequoia | Ponderosa Fuel Reduction Urban Interface Project | Pile burning | 1079 | 775 |
| Sequoia | Spear Creek Roadside Hazard Tree Mitigation Project | Hazard tree felling, fuel mitigation (removing branches and some downed material), chipping, and piling and burning | 1200 | 633 |
| Sequoia | 2011 Revision 1 to the 1998 Revised | Thinning (hand and mechanical), excavator or hand piling slash, | 2340 | 601 |

Case No. _____

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

| Forest | Project Name | Activities | Project Acres* | Fisher Acres Impacted* |
|--------|--------------|------------|----------------|------------------------|
| | Ice Timber Sale and Fuels Reduction Project | prescribed burn (understory broadcast, jackpot, and pile burn) | | |
| Sequoia | Rough Plantation Maintenance and Restoration Project | Biomass removal, hand thinning, mechanical thinning, hazard tree removal, piling/burning, prescribed fire, and tree planting | 5386 | 194 |

**\*Source of Acreages:  Biological Assessment Project Forms, see hyperlinks**

**Table 2b.  Projects that May Affect Fishers – Sierra National Forest**

| Forest | Project Name | Activities | Project Acres | Fisher Impact Acres |
|--------|--------------|------------|---------------|---------------------|
| Sierra | Cedar Valley Fuels Reduction Project | Hand and mechanical thinning, hazard tree logging, prescribed burning, fuelbreak maintenance | 1210 | 121 |
| Sierra | French Fire Recovery and Reforestation | Mechanical and hand thinning dead trees, pile burning, planting | 3500 | 2062 |
| Sierra | Graveyard of the Giants Trail Hazard Abatement | Hazard tree removal via hand thinning | 1366 | 560 |
| Sierra | Grey's Mountain Ecological Restoration Project | Commercial thinning, hazard tree logging, mastication, piling, pile and prescribed burning | 9581 | 5169 |
| Sierra | Pinegrove Project | Hand and mechanical thinning, hazard tree logging, mastication, prescribed burning | 677 | 88 |
| Sierra | Sugar Pine Adaptive Management | Forest health and commercial thinning (link to old project website, Batch 1 BA not avail.) | 5416 | ? |
| Sierra | Upper Chiquito Creek Bridge Replacement | Road maintenance, road paving, and bridge replacement | 18.5 | 0 |
| Sierra | Whiskey Ridge Ecological Restoration Project | Commercial and hand thinning, hazard tree logging, prescribed burning | 8263 | 8263 |
| Sierra | Aspen Restoration Project | Post-fire salvage logging, hazard tree logging, fuel treatments | 22350 | 15457 |
| Sierra | Bald Mountain Restoration Project | Commercial and pre-commercial thinning, prescribed burning and removal of dead trees (link to decision, Batch 1 BA not available) | 17360 | ? |
| Sierra | Blue Rush Restoration Project | Tree release and removal, mastication, fuelbreaks, herbicides, pile burning | 4800 | 1500 |
| Sierra | Dinkey North Restoration Project | Prescribed burning | 1617 | 1122 |

Case No. _____

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

| Forest | Project Name | Activities | Project Acres | Fisher Impact Acres |
|---|---|---|---|---|
| Sierra | Dinkey South Restoration Project | Prescribed burning (no new BA, no link to project files) | ? | ? |
| Sierra | Eastfork Restoration Project | Hazard tree logging | 5078 | 1916 |
| Sierra | Exchequer Restoration Project | Commercial thinning, fuel treatments, hazard tree logging, prescribed burning | 18345 | 7158 |
| Sierra | FY19 Joint Chiefs Fuelbreak Project | Hazard tree logging, mechanical and hand thinning, pile burning | 11354 | 3123 |
| Sierra | Madera and Mariposa County Roads Hazard Abatement Project | Hazard tree logging by mechanical thinning, piling, pile burning | 27761 | 5237 |
| Sierra | San Joaquin Hazard Tree Abatement Project | Hazard tree logging by mechanical thinning | 23000 | 782 |
| Sierra | Soaproot Restoration Project | Commercial thinning and fuel treatments, mastication, prescribed burning | 7000 | 4100 |
| Sierra | Fish Camp Project | Thinning, plant and release, treat slash, piling, pile and underburning | 1200 | 966 |
| Stanislaus | North Merced Prescribed Burn | Prescribed burning (link to old project website, Batch 1 BA not available) | 12000 | ? |

**\*Source of Acreages:  Biological Assessment Project Forms, see hyperlinks**

88.    USFS recently informed Plaintiffs that the Bull Run (Sequoia NF), Spear Creek (Sequoia NF), San Joaquin (Sierra NF), Soaproot (Sierra NF), Cedar Valley (Sierra NF), Madera and Mariposa County (Sierra NF) projects have been completed and that the North Road (Sequoia NF) project has been cancelled.

89.    USFS also informed Plaintiffs that Slide Rock (Sequoia NF), Ponderosa (Sequoia NF), Pier Fire (Sequoia NF), Whisky Ridge (Sierra NF), Blue Rush (Sierra NF), French Fire (Sierra NF), Musick (Sierra NF), and Pinegrove (Sierra NF) projects are undergoing reevaluation for various reasons, but to the best of Plaintiffs' knowledge, USFS has not reinitiated consultation for any of these projects.

90.    Plaintiffs are informed and believe, and on that basis allege, that there are other known projects which may affect SSN fishers where the USFS and FWS consulted separately or

have not yet consulted or completed consultation, including but not limited to the projects identified in Table 3 below:

**Table 3. – Other Projects that May Affect Fishers**

| Forest | Project Name | Activities | Project Acres | Fisher Acres Impacted |
|--------|--------------|------------|---------------|------------------------|
| Sequoia | Plateau Roads Hazard Tree Project | Hazard tree logging, with LOP ending May 31 (p. 11 of BA) | 2193 | 1066 |
| Sequoia | SQF Complex Castle Fire Roadside Hazard Tree Project | Hazard tree logging, mastication, piling, pile burning | 9455 | ? |
| Stanislaus | Rim Fire Recovery (no new BA, link to project files) | Post-fire salvage logging, hazard tree logging, mastication, piling, pile burning | 43337 | ? |

**\* Sources of Acreages:  Project files & calculations based on road mileage, see hyperlinks.**

91.     Plaintiffs are informed and believe, and on that basis allege, that several of the actions identified in the foregoing tables have been or will be modified by USFS in response to the recent Creek and SQF Complex/Castle Fires and can no longer meet the purpose and need of the proposed actions.

92.     Plaintiffs are informed and believe, and on that basis allege, that many other USFS actions within SSN fisher habitat, including direct responses to the recent Creek and SQF Complex/Castle Fires such as fire suppression activities, tree felling and burning during the fire, burned area rehabilitation, hazard tree felling, and other activities, have not been the subject of ESA consultation.

93.     As the foregoing allegations demonstrate, neither FWS nor USFS know the current size of the SSN fisher population, its long-term survival trajectory and recovery prospects, or the threshold population size below which further habitat activity would jeopardize the continued existence of the species.  FWS has explicitly acknowledged these facts to Plaintiffs.

**E.     Conservation Measures**

94.     Especially given the extremely small size of the SSN fisher population, successful reproduction and dispersal of juveniles are critical to the species' survival and long-term recovery. To support fishers' successful reproduction and to protect fishers from predation, forest structure

Case No. _____

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

must provide both natal and maternal den and rest sites.  Final Species Report at 17.  After their birth in the spring, fisher kits do not become mobile for about four months, after which time they continue to travel with the mother fisher in her home range until they disperse into their own home ranges at about one year of age; in the southern Sierra Nevada, juvenile dispersal begins in March of the year following the kits' birth.  *Id.* at 10, 14.

95.     In an attempt to develop conservation measures to protect breeding fishers, USFS and FWS have adopted Limited Operating Periods that extend through either May or June each year.  FWS and USFS have not produced any scientific study, data, information, or analysis to support lifting the LOPs in May or June.  Likewise, the agencies have not provided supporting evidence to show that the short spring season LOPs are effective in providing sufficient mitigation from noise and/or disturbance to avoid the take of fishers.

**F.     Supplemental NEPA Review**

96.     The USFS projects identified in Tables 1, 2a, 2b, and 3 were approved at different times and subject to different levels of NEPA review.  While the NEPA documentation for some of these projects has been updated to reflect new information or changed circumstances, Plaintiffs are informed and believe, and on that basis allege, that USFS has not undertaken supplemental NEPA review for all or most of these projects to evaluate the nearly 55 percent reduction of SSN fisher suitable habitat on the national forests over the last decade, and the unquantified (by USFS or FWS) loss and degradation of fisher habitat due to logging of snags in drought-affected and fire-affected areas.

97.     In particular, USFS has not undertaken an adequate cumulative effects analysis for its continuing or proposed discretionary logging, vegetation management, and other actions in light of the dramatic and significant changes in the environmental baseline, particularly with respect to the degradation or loss of fisher critical denning and resting habitat across the southern Sierra Nevada national forest landscape.  Accordingly, USFS has not yet adequately considered and disclosed to the public the cumulative impacts, and potential alternatives to address those impacts, from continued logging, vegetation management, and other disturbance activities in suitable fisher habitat.

## CLAIMS FOR RELIEF

### First Cause of Action
**Violation of ESA Section 7 for Unlawful Biological Opinion**
**(Against Defendant U.S. Fish and Wildlife Service)**

1.      Plaintiffs hereby reallege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs.

2.      In issuing the 2020 Programmatic Biological Opinion/Incidental Take Statement and the amended 2021 Programmatic Biological Opinion, Defendant FWS violated, and continues to violate, section 7(a)(2) of the ESA.  These Biological Opinions are legally defective in numerous ways, including but not limited to:

     a.    They unlawfully fail to "use the best available scientific and commercial data available" in evaluating whether the proposed USFS projects are likely to jeopardize the existence of the SSN fisher DPS;

     b.    They unlawfully fail to evaluate the current status of the SSN fisher DPS and the appropriate environmental baseline or cumulative effects to that environmental baseline, as required by 50 C.F.R. § 402.14;

     c.    They unlawfully fail to include an actual analysis of the effects of the proposed USFS actions and activities on the SSN fisher DPS and instead speculate about effects based on inadequate data and inapposite studies;

     e.    They unlawfully fail to consider all relevant factors and entirely fail to consider important aspects of the problem, such as the fact that even the most optimistic population size estimates for the SSN fisher DPS are an order of magnitude smaller than the minimal viable population for the species;

     f.    They unlawfully rely on scientifically unsupported theories about long-term "benefits" of USFS "vegetation management" actions that are unlikely to occur, or speculative and highly uncertain, to reach the conclusion that proposed USFS actions and activities are not likely to jeopardize the continued survival of the SSN fisher DPS, even as they fail to fully consider

important dynamics of wildfire behavior that may affect future
vulnerability to such fires;

g.    They unlawfully fail to provide adequate support or analysis for the
conclusion that the proposed USFS actions and activities will not jeopardize
the continued existence of the SSN fisher DPS;

h.    They unlawfully fail to independently and meaningfully evaluate
the impact of USFS proposed actions and activities on the recovery of the
SSN fisher DPS, and they lack any supporting science for the summary
conclusions on recovery;

i.    They unlawfully fail to articulate a rational connection or explanation for
the level of incidental take allowed; and

i.    They unlawfully fail to formulate reasonable and prudent conservation
measures, including the LOP, that are adequately supported by scientific
evidence and sufficient to avoid take of fisher mothers and kits during the
full reproductive season.

3.    In these and other ways, the 2020 Programmatic Biological Opinion/Incidental
Take Statement and the revised 2021 Programmatic Biological Opinion for the SSN fisher violate
ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), and its implementing regulations, as well as the
procedural requirements of the APA.

4.    The failure of FWS to comply with its mandatory legal duties under the ESA and
the APA is harming the interests of Plaintiffs and their members in the conservation and long-term
survival of the SSN fisher and in the restoration of a healthy, interconnected ecosystem across the
national forest landscape in the southern Sierra Nevada.  Because FWS's actions are arbitrary,
capricious, an abuse of discretion, unsupported by scientific evidence, and otherwise not in
accordance with law, they are subject to judicial review under 5 U.S.C. § 706(2).

**Second Cause of Action**
**Violation of ESA Section 7 for Failure to Reinitiate Consultation**
**(Against Defendant U.S. Forest Service)**

5.      Plaintiffs hereby reallege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs.

6.      Although Defendant USFS purported to reinitiate programmatic consultation on its ongoing and proposed projects throughout the Sierra and Sequoia National Forests following the 2020 wildfires, it has not received concurrence from FWS that the logging and other vegetation management projects are not likely to adversely affect SSN fishers or incidental take authorization from FWS that the projects are not likely to jeopardize the continued existence of the species.

7.      Accordingly, before USFS or its contractors may move forward with any project that may affect the SSN fisher or its suitable habitat, including suitable post-fire habitat, USFS must reinitiate consultation on the projects and obtain concurrence or take authorization from FWS pursuant to section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), that adequately and meaningfully evaluates both the survival and recovery of the species based on credible science and current data concerning population size and viability.

8.      Unless and until USFS receives such FWS authorization on any project that may affect the SSN fisher or its suitable habitat, USFS and its contractors are prohibited under section 7(d), 16 U.S.C. § 1536(d), from making any irreversible or irretrievable commitment of resources, including the logging of trees, the removal of structural components like snags on which fishers rely, or other "vegetation management" activities that may affect fisher use.

**Third Cause of Action**
**Violation of NEPA for Failure to Prepare**
**Supplemental Cumulative Impacts Analysis**
**(Against Defendant U.S. Forest Service)**

9.      Plaintiffs hereby reallege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs.

10.      Defendant USFS has violated, and is continuing to violate, NEPA by failing to prepare landscape-level supplemental environmental review of the cumulative impacts to the SSN fisher DPS from the drought, associated tree mortality, substantial wildfires, and continued logging, including post-fire logging of suitable fisher habitat, and other USFS activities that have occurred in the Sierra, Sequoia, and Stanislaus National Forests over the last decade.

11.      Although USFS previously issued Environmental Assessments or categorical exclusions for many projects, the analyses in those documents have been rendered obsolete and inadequate by the alteration, reduction, or degradation of SSN fisher habitat as a result of the Creek and SQF Complex/Castle Fires in late 2020.  These events constitute significant new information and changed circumstances that require supplemental NEPA review and an updated landscape-level cumulative impacts analysis, including a full and meaningful consideration of alternatives and mitigation measures, based on the current credible science and current population estimates.

12.      The failure of USFS to comply with its mandatory legal duties under NEPA is harming the interests of Plaintiffs and their members in the conservation and long-term survival of the SSN fisher and in the restoration of a healthy, interconnected ecosystem across the national forest landscape in the southern Sierra Nevada.  Because USFS's actions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, they are subject to judicial review under 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Declare that the 2020 Programmatic Biological Opinion/Incidental Take Statement and the 2021 Programmatic Biological Opinion violate the ESA and the APA;

2.      Set aside the 2020 Programmatic Biological Opinion/Incidental Take Statement and the 2021 Programmatic Biological Opinion;

3.      Enjoin USFS from relying on any concurrence or authorization conveyed by the 2020 Programmatic Biological Opinion/Incidental Take Statement and the 2021 Programmatic Biological Opinion until and unless these documents are revised to fully comply with the ESA and the APA;

4.      Declare that USFS is violating NEPA by its failure to prepare and circulate for public review supplemental environmental review that adequately and meaningfully considers the cumulative landscape impacts from its ongoing, proposed, and reasonably foreseeable projects on SSN fisher habitat and the survival and recovery of the species;

5.      Enjoin USFS from carrying out, or permitting its contractors to carry out, any projects that may affect SSN fishers or their habitat, including post-fire habitat, until and unless USFS prepares and circulates a supplemental NEPA analysis that evaluates the cumulative effects of its ongoing, proposed, and reasonably foreseeable projects on the species and habitat;

6.      Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements associated with this action; and

7.      Grant Plaintiffs such additional relief as the Court may deem just and proper.

Date:  March 26, 2021                          ENVIRONMENTAL LAW CLINIC
                                               Mills Legal Clinic at Stanford Law School

                                               By: _____
                                                       Deborah A. Sivas

                                               *Attorneys for Plaintiffs UNITE THE PARKS*

Date:  March 26, 2021                          NATURAL RESOURCES LAW

                                               By: _____
                                                       René Voss

                                               *Attorney for Plaintiffs SEQUOIA FORESTKEEPER*
                                               *and EARTH ISLAND INSTITUTE*

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF